PHILLIP A. TALBERT
United States Attorney
TARA AMIN
Assistant United States Attorney
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile: (916) 554-2900

AMANDA N. LISKAMM
Director
RACHAEL L. DOUD
Assistant Director
ANDREW K. CRAWFORD
FRANCISCO L. UNGER
Trial Attorneys
Consumer Protection Branch
Civil Division
U.S. Department of Justice
450 5th Street, NW
Washington, DC 20530
Telephone: (202) 451-7301
Email: andrew.k.crawford@usdoj.gov

Attorneys for Plaintiff United States of America

FILED
Dec 01, 2023
CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

SEALED

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

United States of America,

Plaintiff,

v.

CB SURETY, LLC, et al.,

Defendants.

Civil Case No. 2:23-cv-2812 TLN DB

BRIEF IN SUPPORT OF EX PARTE MOTION FOR (1) TEMPORARY RESTRAINING ORDER WITH ASSET FREEZE, APPOINTMENT OF A TEMPORARY RECEIVER, OTHER EQUITABLE RELIEF, AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE AND (2) ORDER WAIVING NOTICE REQUIREMENT

FILED UNDER SEAL PURSUANT TO ORDER OF THE COURT
DATED ______________________

[FILED/LODGED CONCURRENTLY UNDER SEAL: AFFIDAVIT OF UNITED STATES POSTAL INSPECTOR JASON CHUNG; *EX PARTE* RECOMMENDATION FOR TEMPORARY RECEIVER; *EX PARTE* MOTION FOR (1) TEMPORARY RESTRAINING ORDER WITH ASSET FREEZE, APPOINTMENT OF A TEMPORARY RECEIVER, OTHER EQUITABLE RELIEF, AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE AND (2) ORDER WAIVING NOTICE REQUIREMENT; [PROPOSED] ORDER]

## TABLE OF CONTENTS


I. INTRODUCTION .......... 9

II. STATEMENT OF FACTS .......... 10

- A. Structure of the Scheme .......... 10
- B. Defendants Use Sham Companies to Launder Transactions for Merchant Clients .......... 12
- C. Defendants Use Microtransactions to Fraudulently Reduce Merchant Clients' High Chargeback Rates .......... 14
- D. Defendants' Roles and Knowledge of Fraud .......... 15

III. ARGUMENT .......... 16

- A. 18 U.S.C. § 1345 Authorizes Injunctive Relief .......... 16
- B. The United States is Overwhelmingly Likely to Succeed in Proving That Defendants Are Committing Bank and Wire Fraud .......... 19
- C. Likelihood of Irreparable Harm .......... 23
- D. Balance of Hardships and the Public Interest .......... 23
- E. The Proposed *Ex Parte* TRO is Appropriate and Necessary .......... 24

IV. THE UNITED STATES WILL NOTIFY DEFENDANTS PROMPTLY FOLLOWING ENTRY OF THE TRO AND ORDER .......... 28

V. CONCLUSION .......... 29

# TABLE OF AUTHORITIES

**Cases**

*Baird v. Bonta*,
No. 23-15016, 2023 WL 5763345 (9th Cir. Sept. 7, 2023) .................................................... 17

*Canada Life Assur. Co. v. LaPeter*,
563 F.3d 837 (9th Cir. 2009) ............................................................................................. 27

*F.T.C. v. Cardiff*,
No. 18-cv-2104, 2018 WL 5622644 (C.D. Cal. Oct. 10, 2018) ................................. 24, 26, 28

*F.T.C. v. Consumer Def., LLC*,
926 F.3d 1208 (9th Cir. 2019) ........................................................................................... 18

*F.T.C. v. Digital Altitude LLC*,
No. 2:18-CV-00729, 2018 WL 1146679 (C.D. Cal. Mar. 1, 2018).................................. 24, 28

*F.T.C. v. World Wide Factors, Ltd.*,
882 F.2d 344 (9th Cir. 1989) ............................................................................................. 24

*FTC v. Am. Mortg. Consulting Grp., LLC*,
No. SACV12-01561 DOC, 2012 WL 4718927 (C.D. Cal. Oct. 1, 2012) ............................... 26

*Glasser v. Blixseth*,
No. C14-1576 RAJ, 2014 WL 12514894 (W.D. Wash. Nov. 14, 2014)................................ 28

*Harris v. Board of Supervisors, Los Angeles Cnty.*,
366 F.3d 754 (9th Cir. 2004) ............................................................................................. 17

*Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*,
736 F.3d 1239 (9th Cir. 2013) ........................................................................................... 18

*In re ChinaCast Educ. Corp. Sec. Litig.*,
809 F.3d 471 (9th Cir. 2015) ............................................................................................. 21

*Loughrin v. United States*,
573 U.S. 351 (2014)........................................................................................................... 21

*Muddiman v. Eide*,
No. 16-30067, ECF Doc. 13 (N.D. Ca. Sept. 20, 2016) ......................................................... 27

*Shaw v. United States*,
580 U.S. 63 (2016)....................................................................................................... 19, 21

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
240 F.3d 832 (9th Cir. 2001) ............................................................................................. 17

*United States v. Am. Heart Rsch. Found.*,
996 F.2d 7 (1st Cir. 1993) .......... 17

*United States v. Brown*,
988 F.2d 658 (6th Cir. 1993) .......... 18

*United States v. Brugnara*,
856 F.3d 1198 (9th Cir. 2017) .......... 22

*United States v. Cotter*,
No. 1:20cv24216 (S.D. Fla. Oct. 15, 2010) .......... 17

*United States v. Dearing*,
504 F.3d 897 (9th Cir. 2007) .......... 22

*United States v. Duran*,
189 F.3d 1071 (9th Cir. 1999) .......... 22

*United States v. Elagoon Business Solutions PVT Ltd.*,
No. 19-324 (W.D. Wash. May 2, 2019) .......... 28

*United States v. Guess*,
No. 04CV2184-LAB, 2004 WL 3314940 (S.D. Cal. Dec. 15, 2004) .......... 18

*United States v. Hoffman*,
560 F. Supp. 2d 772 (D. Minn. 2008) .......... 28

*United States v. Internet Transaction Servs., Inc.*,
No. 2:21cv6582 (C.D. Cal. Aug. 20, 2021) .......... 17, 28

*United States v. Levashov*,
No. 3:17-cv-00074-TMB, 2017 WL 1398662 (D. Alaska Apr. 12, 2017) .......... 17, 18

*United States v. Lindsey*,
850 F.3d 1009 (9th Cir. 2017) .......... 19

*United States v. Lovett*, 668 F. App'x 230 (9th Cir. 2016) .......... 19

*United States v. Morris*,
No. CV10-4436, 2010 WL 4796664 (C.D. Cal. Nov. 18, 2010) .......... 17, 18

*United States v. Proshak*,
No. CR 13-00264-SJO, 2015 WL 13388251 (C.D. Cal. Mar. 31, 2015) .......... 22

*United States v. Reeves*,
No. 2:19-cv-325-BJR , 2019 WL 7833107 (W.D. Wash. Oct. 15, 2019) .......... 18

*United States v. Rogers*,
321 F.3d 1226 (9th Cir. 2003) .......... 19

*United States v. Sriram*,
147 F.Supp.2d 914 (N.D. Ill. 2001) .......... 18, 23

*United States v. Stapleton*,
293 F.3d 1111 (9th Cir. 2002) .......... 19

*United States v. Weigand*,
482 F. Supp. 3d 224 (S.D.N.Y. 2020) .......... 21

*United States v. William Savran & Assocs., Inc.*,
755 F. Supp. 1165 (E.D.N.Y. 1991) .......... 18, 24

*Winter v. Nat Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .......... 17

**Statutes**

18 U.S.C. § 20 .......... 20

18 U.S.C. § 1343 .......... 22, 26

18 U.S.C. § 1344 .......... 19, 20, 21, 26

18 U.S.C. § 1345 .......... passim

18 U.S.C. § 1349 .......... 22

18 U.S.C. § 3322 .......... 26

**Other Authorities**

S. Rep. No. 98-225, reprinted in 1984 U.S.C.C.A.N. 3182 .......... 17, 25

**Rules**

Federal Rule of Civil Procedure 4 .......... 28

Federal Rule of Civil Procedure 65 .......... 24, 28

# I. INTRODUCTION

The United States brings this action to stop ongoing criminal wire and bank fraud that targets financial institutions and consumers throughout the country, including in this District. Since at least 2017, Defendants have engaged in a two-fold scheme to defraud financial institutions and consumers. First, Defendants launder transactions for their merchant clients by creating sham companies to disguise the true nature of their merchant clients' fraudulent, illegal, or high-risk activities. Second, Defendants use fraudulent chargeback reduction tactics to allow their merchant clients to maintain merchant accounts with member banks of card networks such as Visa and Mastercard. Without these deceptive tactics, these financial institutions would not allow Defendants' merchant clients to use their services to process payments. Defendants' ongoing bank and wire fraud scheme is causing significant financial losses to consumers, including via thousands of unauthorized debits against consumers' payment cards perpetrated by Defendants' merchant clients. Affidavit of Postal Inspector Jason Chung ("Chung Aff.") ¶ 83. Additionally, financial institutions are being harmed by Defendants' scheme, including by risking incurring fraudulent chargeback costs and fines as a result of the scheme's merchant clients' high-risk or illegal activities. *Id.* at ¶¶ 31, 69-71, 80, 139.

To halt Defendants' ongoing violations of the federal wire and bank fraud statutes, the United States moves this Court to enter a non-noticed *ex parte* temporary restraining order ("TRO") under 18 U.S.C. § 1345 and Federal Rule of Civil Procedure 65(b)(1). Overwhelming evidence demonstrates that the United States is likely to prove fraud, and the equities weigh heavily in favor of protecting consumers and financial institutions. The proposed TRO would: (1) enjoin Defendants from pursuing their fraud scheme or destroying relevant evidence; (2) freeze the assets of the corporate defendants and Defendants Thomas Eide and Travis Smith; and (3) appoint a temporary receiver over the corporate defendants, as well as any other entity that the receiver determines is controlled or owned by the corporate defendants or Defendants Eide and Smith. The requested relief is essential to avert further harm to victims and to prevent Defendants from alienating or disposing of property. Additionally, the United States moves for

an order to require Defendants to show cause why this Court should not grant a preliminary injunction extending such temporary relief pending a final adjudication on the merits.

## II. STATEMENT OF FACTS

### A. Structure of the Scheme

Defendant Thomas Eide is an organizer of the fraud scheme, which helps fraudulent and high-risk merchants—who would otherwise likely be excluded from the American financial system—gain and maintain access to banking networks, thereby injuring consumers and financial institutions. Chung Aff. at ¶¶ 21-33. Eide is the founder and a manager of CB Surety LLC ("CB Surety"). *Id.* at ¶¶ 34-35. Defendant Travis Smith is a manager at CB Surety and Eide's business partner. *Id.* at ¶ 36. Companies managed by Eide and Smith, Peak Bakery LLC ("Peak Bakery"), Cascades Pointe at Clemson, LLC ("Cascades Pointe"), and KP Testing, LLC ("KP Testing"), make and receive payments on behalf of CB Surety in furtherance of the scheme. *Id.* at ¶¶ 37, 149, 151-152. Defendants Eide, Smith, CB Surety LLC, Peak Bakery LLC, Cascades Pointe at Clemson, LLC, and KP Testing, LLC will be collectively referred to as the "CB Surety Defendants." CB Surety has no apparent legitimate business operations.

Instead, CB Surety's business is to facilitate payment processing for high-risk, illegal, or fraudulent merchants. *Id.* at ¶¶ 24-33. Financial institutions are unlikely to open merchant accounts for CB Surety's merchant clients because they are engaged in high-risk, illegal, or fraudulent ventures—for example, operating remote technical support scams or selling drugs, such as kratom, which is not legalized across the United States. *Id.* at ¶ 10, 47. Indeed, Eide has specifically touted CB Surety's services to merchants who have been denied access to payment processing services by banks and card networks in the past and have run afoul with financial institutions' due diligence measures. *Id.* at ¶ 47.

To achieve their goal, the CB Surety Defendants work in collaboration with other Defendants to recruit high-risk, illegal, or fraudulent merchants as clients ("merchant clients"). Defendant Stephen Christopher is a merchant account broker who recruits merchant clients for CB Surety. *Id.* at ¶¶ 42, 111-119. Christopher also uses bank accounts held by his companies,

Defendants SJC Financial Services Inc. ("SJC Financial") and Motion Media Marketing Inc., to receive laundered proceeds from sham companies and to transfer those proceeds to CB Surety and its merchant clients. *Id.* at ¶¶ 43, 72-74. Thus, Christopher helps further the scheme by generating new clients and by using his companies as conduits for the transfer of payments among the scheme's participants. Defendants Christopher, SJC Financial, and Motion Media Marketing Inc. will be collectively referred to as "Merchant Account Broker Defendants."

After recruiting merchant clients, the CB Surety Defendants place straw owners to serve as the figureheads of the sham companies that are used to launder the merchant clients' transactions. They accomplish this in collaboration with Defendants Aric Gastwirth, Reseller Consultants, Inc., and Ambragold, Inc. (collectively, "Sham Entity Recruiter Defendants"). *Id.* at ¶¶ 39-41. These Sham Entity Recruiter Defendants oversee the recruitment of straw owners and supervise the establishment of sham companies in straw owners' names, including incorporating the sham companies, opening checking accounts, and signing fake warehouse and fulfillment call center agreements—measures designed to deceive financial institutions conducting due diligence into believing that the sham companies are real businesses. *Id.* at ¶¶ 29, 48-57.

After identifying straw owners and setting up sham companies, the CB Surety Defendants apply for and maintain merchant accounts for the sham companies with the help of Defendant Bryan Bass, who is the founder and director of Defendants Think Processing LLC and Bass Business Consultants (collectively "Merchant Account Servicer Defendants"). *Id.* at ¶¶ 120–121, 124–136. Bass and his employees also help to bolster the scheme's sham companies through the creation of fake websites, *id.* ¶ 54, and by management of their assigned email and phone lines, *id.* at ¶¶ 61, 120–125, which are in fact routed back to—and controlled by—the CB Surety Defendants, *id.* at ¶¶ 58–61.

With the sham companies in place, Defendants manage a complex fraud scheme involving transaction laundering and fraudulent chargeback reduction to facilitate their merchant clients' access to payment processing services.

**B. Defendants Use Sham Companies to Launder Transactions for Merchant Clients**

Defendants' use of transaction laundering began at least as early as April 2019, when the Sham Entity Recruiter Defendants started recruiting individuals to serve as straw owners of sham companies affiliated with the CB Surety Defendants. *Id.* at ¶ 48. The Sham Entity Recruiter Defendants typically send straw owners an "Entity Formation Sheet" requesting documentation required to establish the sham company. *Id.* at ¶¶ 48-49. With this information, the Sham Entity Recruiter Defendants incorporate two sham businesses in the name of each straw owner. *Id.* at ¶¶ 50-51. The naming of the sham company typically follows a particular pattern: three apparently random words followed by the LLC designation, where the first word in the sham company's name shares the same letter as the straw owner's first name. *Ibid.* Sham Entity Recruiter Defendants also create fake websites for the sham companies to advertise legitimate business activities and integrate these fake websites into CB Surety's payment gateways. *Id.* at ¶¶ 54-57. In fact, the sham companies' purported goods and services do not exist, and their websites are merely "front website[s]." *Id.* at ¶¶ 54-55.

Similarly, the straw owners are merely paper figureheads of the sham companies, which Defendants effectively control. *Id.* at ¶¶ 58-61. For example, the "support" email addresses listed on the sham companies' websites are directed to an email system controlled by Defendants. *Id.* at ¶ 58. Defendants also maintain the login information for the sham companies' Gmail and Google Voice accounts used to conduct their businesses. *Id.* at ¶ 59. Additionally, Defendants forward incoming phone calls to sham companies' Google Voice accounts to their Google Voice accounts. *Id.* at ¶ 61.

After Defendants create sham companies, they initiate numerous applications for merchant accounts. *Id.* at ¶ 62. In these applications, Defendants do not disclose that they, not the straw owners, operate the suspected sham companies; that their merchant clients, and not the sham companies, will be using the account; or that the account will be used to facilitate transactions furthering high-risk, fraudulent, or illegal activities. *Id.* Defendants substantiate their misrepresentations to financial institutions by listing the sham companies' websites on their

account applications and falsely representing that the sham company had contracted for legitimate warehousing and fulfillment services. *Id.*

Defendants then launder their high-risk, fraudulent, or illegal merchant clients' business transactions through sham companies' merchant accounts. Defendants take the sham company's website and integrate it with CB Surety's technology platform, which links payments made to its merchant clients with its sham companies. This linking enables a transaction made to or by a high-risk, illegal, or fraudulent merchant client to appear to the bank holding its merchant account, also known as the "acquiring bank," as if it was made to or by the sham company for a legitimate purpose. Each of these sham companies' internet domains corresponds with an application for merchant accounts submitted by Defendants to banks.

For example, one of CB Surety's merchant clients was Sebastian Guthery, who owned online businesses that sold the drug kratom. *Id.* at ¶¶ 65-67. Defendants created sham company Diamani Urban Ventures LLC so Guthery's kratom businesses could accept credit card payments from online customers. *Id.* After making an online purchase, kratom customers received an email notifying them that their bank statements would show the purchase as "DIAMANI URBAN VE SILVER SPRING." *Id.* at ¶ 67.

When financial institutions and their payment processors try to confirm the legitimacy of the sham companies' business or investigate suspicious activity on the sham company's account, Defendants pose as the sham company's director and provide false information, such as fake invoices, to deceive the financial institution or payment processor. *See, e.g.*, *id.* at ¶ 130.

As of July 2023, Defendants were using over 100 suspected sham companies purporting to sell legitimate goods, but that are instead used to hide the true nature of Defendants' merchant clients' businesses and launder their transactions. *Id.* at ¶ 68. Proceeds from card transactions laundered through these sham companies are transferred to bank accounts held by Defendants and their merchant clients. *Id.* at ¶ 72–74.

If financial institutions knew that Defendants' sham companies were processing the transactions of Defendants' merchant clients through their merchant accounts, they likely would

not have allowed the sham companies to obtain merchant accounts and would close the accounts. *Id.* at ¶¶ 69–71. Further, merchants suspected of illegal activity or who pose a substantial risk to the payment industry are added to a Terminated Merchant File maintained by Mastercard and other similar blacklists maintained by financial institutions and other card networks. *Id.* at ¶¶ 13, 70. If a merchant is included on these lists, financial institutions typically close accounts or reject applications for new accounts from these merchants. *Id.* at ¶ 70. Defendants' merchant clients include merchants that have been banned from accessing payment processing services and are included on such lists, *id.* at ¶ 71, or whose real commercial activities and unmanipulated chargeback rates, but for the scheme, would likely cause them to be banned. *Id.* at ¶¶ 24, 32.

**C. Defendants Use Microtransactions to Fraudulently Reduce Merchant Clients' High Chargeback Rates**

The second way the CB Surety Defendants help their merchant clients fraudulently maintain access to merchant accounts is by artificially lowering the merchant accounts' chargeback rates. *Id.* at ¶¶ 21, 23-24. A chargeback refers to the process of returning charges to a payment card after a consumer disputes a transaction with their bank. *Id.* at ¶ 14. Credit card networks and acquiring banks typically monitor chargebacks by calculating a "chargeback rate." The chargeback rate is the total number of chargebacks in a month divided by the total number of transactions in that month.

For example, if a merchant had five chargebacks out of 100 total transactions in a single month, the merchant's chargeback rate for that month would be five percent. Generally, card networks begin to impose additional requirements and/or penalties on a merchant when a chargeback rate exceeds one to three percent. For example, Mastercard has an Excessive Chargeback Monitoring Program by which it monitors merchants' chargeback rates. If a merchant's chargeback rate is above 1.5 percent for an extended period, Mastercard may assess fees on the acquiring bank.

Because chargebacks are an indicator of fraud, financial institutions closely monitor chargeback rates, impose penalties for high chargeback rates, and establish a chargeback

threshold that does not exceed one to three percent. *Id.* at ¶¶ 16-18. High chargebacks expose financial institutions to credit risk if a merchant is unwilling to or unable to pay back the charge, and legal liability for facilitating fraudulent, deceptive, or unlawful conduct. *Id.* at ¶¶ 19-20.

To avoid exceeding the chargeback rate thresholds established by financial institutions, Defendants fraudulently lower their merchant clients' chargeback rates by using prepaid debit cards to create numerous so-called "microtransactions." These microtransactions are performed at the request of or approval of Defendants' merchant clients. Therefore, none of the microtransactions result in chargebacks, which inflates the merchant client's total number of charges that did not result in chargebacks. As a result, the merchant client's chargeback rate goes down. *Id.* at ¶¶ 75–76, 78–81. Reflecting the scope of Defendants' fraudulent chargeback tactics, Defendants have at times maintained an inventory of hundreds of thousands of dollars' worth of prepaid debit cards on hand. *Id.* at ¶ 81.

**D. Defendants' Roles and Knowledge of Fraud**

CB Surety Defendants: As set forth in detail above, Eide and Smith, individually, and through CB Surety, Peak Bakery, Cascades Pointe, and KP Testing, exercise overall control of the fraud scheme and engaged in all aspects of the scheme. *Id.* at ¶¶ 34–38. Eide and Smith participate in and supervise multiple facets of the day-to-day operation of the scheme. *Id.* at ¶¶ 37, 148-152. There are no apparent legitimate activities of CB Surety beyond the fraud scheme.

Merchant Account Broker Defendants: The Merchant Account Broker Defendants recruit high-risk merchant clients. *Id.* at ¶¶ 42, 64. Defendant Christopher uses bank accounts held by his companies, Defendants SJC Financial and Motion Media Marketing Inc., to pass laundered transactions from sham companies to CB Surety and merchant clients. *Id.* at ¶¶ 43, 73, 118.

Sham Entity Recruiter Defendants: Gastwirth, Ambragold, and Reseller Consultants collaborate with the CB Surety Defendants to identify straw owners to serve as heads of sham companies. *Id.* at ¶¶ 39, 48. They then facilitate the establishment of sham companies in the names of straw owners to deceive financial institutions. *Id.* at ¶¶ 50–53. Without Gastwirth's

streamlining of the scheme's process for creating and maintaining scores of sham companies, the scheme likely could not have expanded to such a significant scope.

Merchant Account Servicer Defendants: The Merchant Account Servicer Defendants, along with the CB Surety Defendants, apply for and maintain merchant accounts for the sham companies. *Id.* at ¶¶ 45, 120. Bass also helped with recruitment of high-risk and fraudulent merchant clients who sought to benefit from the scheme's fraudulent tactics, *id.* at ¶ 44, and helped to create and manage fake websites and customer service email and phone lines designed to further the scheme by deceiving financial institutions. *Id.* at ¶ 54, 61, 120, 123. Bass became familiar with the scheme as a client of CB Surety, Eide, and Smith, paying CB Surety for its chargeback tactic services in conjunction with a company operating a remote technical support scam. *Id.* at ¶ 121.

## III. ARGUMENT

The United States is entitled to relief under the Anti-Fraud Injunction statute, 18 U.S.C. § 1345. The facts set forth above and in the attached Declaration of Postal Inspector Chung demonstrate that all Defendants are engaged in an ongoing scheme to commit wire and bank fraud. The Court should order *ex parte* preliminary injunctive relief to protect current and future fraud victims and to prevent Defendants from alienating or disposing of property and destroying important documentation about their enterprise.

### A. 18 U.S.C. § 1345 Authorizes Injunctive Relief

Title 18, Section 1345 authorizes the United States to "commence a civil action in any Federal court to enjoin" persons who are "violating or about to violate" the provisions of the federal fraud statute, including 18 U.S.C. §§ 1343, 1344, and 1349. Section 1345 further provides that a district court "may, at any time before final determination, enter such a restraining order or prohibition, or take such other action, as is warranted to prevent a continuing and substantial injury to the United States or to any person or class of persons for whose protection the action is brought." 18 U.S.C. § 1345(b). Congress enacted Section 1345 out of concern that innocent people would "continue to be victimized" by fraud schemes during the

"months, if not years, before [a] case is ready for criminal prosecution" and the statute is designed to prevent such harm. S. Rep. No. 98-225, at 401–02 (1984), reprinted in 1984 U.S.C.C.A.N. 3182, 3539–40; *see also United States v. Am. Heart Rsch. Found.*, 996 F.2d 7, 11 (1st Cir. 1993) (explaining that because Section 1345 is intended to provide expedited relief, "courts should not handicap and delay injunction actions by insisting that the government assert at the same time [associated] civil damage claims"). Numerous courts, including courts in the Ninth Circuit, have exercised their authority under Section 1345 by issuing temporary restraining orders and preliminary injunctions to disrupt fraud schemes. *See, e.g.*, Order Granting *Ex Parte* Application for Temporary Restraining Order, *United States v. Internet Transaction Servs., Inc.*, No. 2:21cv6582 (C.D. Cal. Aug. 20, 2021), ECF No. 19; *United States v. Morris*, No. CV10-4436, 2010 WL 4796664 (C.D. Cal. Nov. 18, 2010) (preliminary injunction against wire-fraud scheme); *United States v. Kern*, No. 2:18-cv-00283, 2018 WL 1003744 (D. Nev. Feb. 20, 2018) (temporary restraining order against mail-fraud scheme); *United States v. Levashov*, No. 3:17-cv-00074-TMB, 2017 WL 1398662 (D. Alaska Apr. 12, 2017); *see also* Sealed *Ex Parte* Temporary Restraining Order and Order to Show Cause Why a Preliminary Injunction Should Not Issue, *United States v. Cotter*, No. 1:20cv24216 (S.D. Fla. Oct. 15, 2010), ECF No. 8.

In determining whether to grant a temporary restraining order or preliminary injunction, courts in this Circuit consider four factors: (1) whether the movant is likely to succeed on the merits of his claim; (2) whether the movant is likely to suffer irreparable harm absent the preliminary injunction; (3) whether the equities weigh in favor of the proposed injunction; and (4) whether the preliminary injunction is in the public interest. *See Baird v. Bonta*, No. 23-15016, 2023 WL 5763345, at *2 (9th Cir. Sept. 7, 2023) (citing *Winter v. Nat Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)); *Harris v. Board of Supervisors, Los Angeles Cnty.*, 366 F.3d 754, 759 (9th Cir. Apr. 27, 2004); *see generally Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001) (noting that the standard for issuing a temporary restraining order is the same as the one for issuing a preliminary injunction).

If the United States demonstrates that it is likely to succeed on the merits in an action for injunctive relief under 18 U.S.C. § 1345, irreparable harm in the absence of an injunction is presumed. *United States v. Sriram*, 147 F.Supp.2d 914, 937 (N.D. Ill. 2001); *see F.T.C. v. Consumer Def.*, *LLC*, 926 F.3d 1208, 1214 (9th Cir. 2019) (no showing of irreparable harm "is required when injunctive relief is sought in conjunction with a statutory enforcement action where the applicable statute authorizes injunctive relief."); *Morris*, 2010 WL 4796664, at *5 ("When seeking an injunction under the Fraud Injunction Statute, proof of irreparable harm is not necessary."); *United States v. Reeves*, No. 2:19-cv-325-BJR , 2019 WL 7833107, at *2 (W.D. Wash. Oct. 15, 2019).

Courts differ regarding the burden of proof that the United States must meet to obtain temporary injunctive relief under Section 1345. Some courts apply a "probable cause" standard, *see United States v. William Savran & Assocs., Inc.*, 755 F. Supp. 1165, 1177 (E.D.N.Y. 1991), while others apply a "preponderance of the evidence" standard, *see United States v. Brown*, 988 F.2d 658, 663–64 (6th Cir. 1993), and still others apply the traditional "likely to prevail on the merits" standard applicable to private litigants, *see Levashov*, 2017 WL 1398662, at *1. Courts in this Circuit have typically applied the traditional standard in deciding whether to grant a temporary restraining order or preliminary injunction in a Section 1345 action. *See, e.g.*, *Levashov*, 2017 WL 1398662, at *1 (preliminary injunction on finding "good cause to believe" defendants had committed fraud and that the government was "therefore, likely to prevail on the merits"); *Morris*, 2010 WL 4796664, at *5 (issuing preliminary injunction on evidence demonstrating "probable success on the merits"); *United States v. Guess*, No. 04CV2184-LAB, 2004 WL 3314940, at *3–4 (S.D. Cal. Dec. 15, 2004). This Court need not decide which burden of proof applies here, because the United States' evidence more than satisfies any of the foregoing standards. The United States may meet its burden of proof with evidence that would be inadmissible at trial, including hearsay. *See Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250 n.5 (9th Cir. 2013) ("Due to the urgency of obtaining a preliminary injunction at

a point when there has been limited factual development, the rules of evidence do not apply strictly to preliminary injunction proceedings.").

**B. The United States is Overwhelmingly Likely to Succeed in Proving That Defendants Are Committing Bank and Wire Fraud**

It is overwhelmingly likely that the United States will prove that Defendants are engaged in and conspiring to engage in bank and wire fraud.

**1. The evidence demonstrates bank fraud in violation of 18 U.S.C. § 1344(1)**

18 U.S.C. § 1344(1) makes it illegal to "knowingly execut[e], or attemp[t] to execute, a scheme or artifice . . . to defraud a financial institution . . . ." A scheme to defraud, "refers to the overall design to defraud one or many by means of a common plan or technique." *United States v. Rogers*, 321 F.3d 1226, 1229 (9th Cir. 2003) (citations omitted) (construing analogous language in Section 1341). To constitute a criminal violation, the scheme must involve misrepresentations or falsehoods that are "material," meaning that they "have the propensity or capacity to influence" a decision. *See United States v. Lindsey*, 850 F.3d 1009, 1013–14 (9th Cir. 2017) (citations omitted) (construing analogous language in Section 1343). "A knowing participant in a scheme to defraud is vicariously liable for substantive acts of[] fraud committed by co-schemers," even if they do not personally make the relevant misrepresentations. *United States v. Stapleton*, 293 F.3d 1111, 1117 (9th Cir. 2002) (construing Sections 1341 and 1343); *see also United States v. Lovett*, 668 F. App'x 230, 231 (9th Cir. 2016) (applying *Stapleton* to Section 1344). A defendant's knowing engagement in a "scheme fraudulently to obtain funds from a bank depositor's account" violates Section 1344(1), since "the bank, too, ha[s] property rights in [an accountholder's] bank account." *Shaw v. United States*, 580 U.S. 63, 66–67 (2016) (noting that "[w]hen a customer deposits funds, the bank ordinarily becomes the owner of the funds").

The facts set forth above and in the Affidavit of Postal Inspector Chung establish a high likelihood that the United States will be able to prove all elements of a Section 1344(1) violation as to each Defendant. Defendants are engaged in a common scheme—using the transaction

laundering and chargeback reduction tactics—to defraud financial institutions into providing high-risk merchants and merchants engaged in illegal and fraudulent activities with payment processing services and merchant accounts, many of which are held by federally insured financial institutions protected by Section 1344. *See* Chung. Aff. at ¶¶ 147, 149. The scheme involves numerous material falsehoods conveyed to financial institutions including misrepresentations about the nature of the merchant clients' business, straw owners controlling sham companies, the sham companies' purported business activities, and sham microtransactions conducted to deceive financial institutions. *See supra* at 5-11.

The Defendants' falsehoods are material in several ways. First, acquiring banks will not do business with people or entities employing the Defendants' tactics because they risk forfeiting the dollar amount of the chargebacks that Defendants' merchant clients incur using fraudulently obtained and maintained merchant accounts. Second, the acquiring banks that Defendants deceive may incur financial penalties imposed by card networks by unknowingly permitting Defendants to process payments for merchant clients engaged in fraudulent, illegal, or high-risk activities. Finally, the banks may incur reputational harm that translates into lost business.

For example, Esquire Bank and U.S. Bank, both financial institutions as defined in 18 U.S.C. § 20 and 18 U.S.C. § 1344, during their due diligence process identified sham companies created by Defendants. Both banks closed the sham companies' merchant accounts immediately to avoid facilitating any illegal business, incurring any financial penalties, and suffering reputational harm. Even after the closure of these accounts, however, Defendants continued to hold merchant accounts in the name of other sham companies at Esquire Bank and U.S. Bank. *See* Chung Aff. at ¶¶ 137-42.

All Defendants have knowingly participated in the scheme. The CB Surety Defendants controlled and engaged in all aspects of the scheme. *See supra* at 5-11. Merchant Account Broker Defendants knowingly recruited merchant clients to benefit from the scheme. *See supra* at 5-6. The Sham Entity Recruiter Defendants help recruit straw owners to serve as paper figureheads of the sham companies and to incorporate those sham companies. *See supra* at 6-7.

The Merchant Account Servicer Defendants apply for and maintain merchant accounts for the sham companies. *See supra* at 6. And the sham companies share in the knowledge and culpability of the individuals who own and operate them—namely, the Defendants. *See generally*, *In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 476 (9th Cir. 2015). In short, the evidence leaves little doubt that all Defendants are knowingly executing a scheme to defraud multiple financial institutions.

**2. The evidence demonstrates bank fraud in violation of 18 U.S.C. § 1344(2)**

"A provision of the federal bank fraud statute, 18 U.S.C. § 1344(2), makes criminal a knowing scheme to obtain property owned by, or in the custody of, a bank 'by means of false or fraudulent pretenses, representations, or promises.'" *Loughrin v. United States*, 573 U.S. 351, 353 (2014) (quoting Section 1344(2)). Thus, to show a violation of Section 1344(2), the United States must prove: (1) "that the defendant intend[ed] to obtain any of the moneys or other property owned by, or under the custody or control of, a financial institution," and (2) "that the envisioned result—i.e., the obtaining of bank property—occur[red] by means of false or fraudulent pretenses, representations, or promises." *Id.* at 355–56 (internal quotation marks and citations omitted). The conduct prescribed by 18 U.S.C. § 1344(2) overlaps substantially with the conduct prohibited by § 1344(1). *See Shaw*, 580 U.S. at 70–71 (recognizing this overlap).

The same evidence cited above as to Section 1344(1) applies here. The purpose of the scheme is to obtain payment processing through accounts at financial institutions, Defendants carry out this scheme by means of materially false pretenses and representations, and Defendants do so knowingly. These facts establish the high likelihood that Defendants have also violated and continue to violate Section 1344(2). *See, e.g.*, *United States v. Weigand*, 482 F. Supp. 3d 224, 235–36 (S.D.N.Y. 2020), *as corrected* (Sept. 2, 2020) (holding that indictment properly alleged violation of Section 1344(2) based on allegations that defendants created fictitious businesses to "fool the banks into approving marijuana credit card and debit card sales by disguising [the nature of merchants'] transactions as sales of dog food and the like.").

**3. The evidence demonstrates wire fraud in violation of 18 U.S.C. § 1343**

To prove a violation of 18 U.S.C. § 1343, the United States must demonstrate that Defendants (1) are participating in a scheme to defraud, (2) that uses wire, radio, or television to further that scheme, and (3) are acting with the specific intent to defraud. *See United States v. Brugnara*, 856 F.3d 1198, 1207 (9th Cir. 2017). Intent to defraud can be established though indirect evidence, *see id.* at 1208, including by showing that Defendants acted with reckless indifference to the truth or falsity of their statements. *See United States v. Dearing*, 504 F.3d 897, 902–03 (9th Cir. 2007).

Again, the evidence that proves Defendants' knowing participation in a bank fraud scheme also establishes the likelihood that the United States will prove they are participating in a wire fraud scheme with the intent to defraud consumers, their banks, and payment processors. And there is no question that the United States will prove the "use of wire" element. The email and telephone communications through which Defendants make their misrepresentations function over wire. Likewise, using the payment processing system requires wire transmissions. *See* Chung Aff. at ¶ 63.

**4. The evidence demonstrates conspiracy to defraud in violation of 18 U.S.C. § 1349**

The evidence also establishes a likelihood that each Defendant is engaged in a conspiracy to commit fraud in violation of 18 U.S.C. § 1349. "Conspiracy is established 'when there is an agreement to accomplish an illegal objective, coupled with one or more overt acts in furtherance of the illegal purpose and the requisite intent necessary to commit the underlying substantive offense.'" *United States v. Proshak*, No. CR 13-00264-SJO, 2015 WL 13388251, at *4 (C.D. Cal. Mar. 31, 2015) (quoting *United States v. Bailey*, 607 F.2d 237, 243 (9th Cir. 1979)); *see also United States v. Duran*, 189 F.3d 1071, 1080 (9th Cir. 1999).

Here, email communications and other evidence show that all Defendants have acted in concert and reached a meeting of the minds as to their joint participation in the scheme to

defraud financial institutions through transaction laundering and chargeback reduction tactics. *See supra* at 5-11.

**C. Likelihood of Irreparable Harm**

As discussed above, if the United States demonstrates that it is likely to succeed on the merits in an action for injunctive relief under 18 U.S.C. § 1345, irreparable harm in the absence of an injunction is presumed. *See United States v. Sriram*, 147 F.Supp.2d 914, 937 (N.D. Ill. 2001). The United States has demonstrated in the Declaration of Postal Inspector Chung and the exhibits attached thereto that Defendants have violated and continue to violate at 18 U.S.C. §§ 1343, 1344, and 1349. Therefore, there is a presumption that irreparable harm will occur if Defendants' actions are not enjoined. In any event, the facts reflected in the Affidavit and exhibits demonstrate a high likelihood of irreparable harm, as, absent injunctive relief, Defendants will continue to victimize consumers and banks.

Moreover, the presumption of irreparable harms makes eminent sense on these facts. Defendants are not engaged in any legitimate business, are sophisticated users of financial technology, and operate multiple shell entities and sham companies. This knowledge and existing business structure positions Defendants to quickly dissipate assets if enforcement is pursued through other means.

**D. Balance of Hardships and the Public Interest**

The tactics the Defendants employ have no legitimate business purpose aside from defrauding acquiring banks and payment processors. Defendants have engaged in this blatant fraud for years, causing harm to financial institutions and consumers. Reports created and circulated among Defendants suggest that Defendants' scheme has assisted merchant clients in collectively processing at least $97 million in payments from July 2020 to June 2023. *See* Chung Aff. at ¶ 154. There is no question that there would be a significant benefit to the public in stopping this brazen fraud. This factor weighs strongly in favor of granting the United States' request.

The balance of equities also weighs in the United States' favor. "[W]hen a district court balances the hardships of the public interest against a private interest, the public interest should receive greater weight." *F.T.C. v. World Wide Factors, Ltd.*, 882 F.2d 344, 347 (9th Cir. 1989). Here, the public interest in stopping Defendants from continuing to pursue a long-operating fraud scheme far outweighs any interest Defendants could have in their scheme. Likewise, the public interest in preventing Defendants from alienating or disposing of their property or gains, and thereby potentially thwarting any effort to recover restitution for their victims, outweighs the Defendants' interest in profiting from the proceeds of their fraud. *C.f. F.T.C. v. Cardiff*, No. 18-cv-2104, 2018 WL 5622644, at *2 (C.D. Cal. Oct. 10, 2018) (equities favored TRO given evidence of violations of the FTC Act); *F.T.C. v. Digital Altitude LLC*, No. 2:18-CV-00729, 2018 WL 1146679, at *2 (C.D. Cal. Mar. 1, 2018) (same).

**E. The Proposed *Ex Parte* TRO is Appropriate and Necessary**

The proposed non-noticed *ex parte* TRO is appropriate, necessary, and well within the Court's authority. Section 1345 authorizes courts to impose a broad spectrum of *ex parte* and preliminary relief to prevent fraud and protect victims. *See* 18 U.S.C. § 1345(b) (a court may "enter such a restraining order or prohibition, or take such other action, as is warranted to prevent a continuing and substantial injury"); *see also Savran*, 755 F. Supp. at 1182 ("Section 1345 has been held to vest the federal courts with power to decree broad remedial preliminary relief."). These remedies specifically include freezing a defendant's assets and appointing a temporary receiver. *See* 18 U.S.C. § 1345(a)(2). A TRO may be entered without prior notice where notice would result in "immediate and irreparable injury, loss or damage." Fed. R. Civ. P. 65(b)(1)(A).

The United States has filed this action to put a stop to Defendants' unlawful scheme and to prevent them from continuing this ongoing fraud. Accordingly, the proposed TRO will: (1) enjoin Defendants from pursuing their fraud scheme or destroying relevant evidence; (2) freeze the assets of the corporate defendants and Defendants Thomas Eide and Travis Smith; and (3) appoint a temporary receiver over the corporate defendants, as well as any other entity that the receiver determines is controlled or owned by the corporate defendants or Defendants

Eide and Smith. Each aspect of the proposed relief falls well within the scope authorized by Section 1345 and is essential to protect current and prospective victims. Entry of the order *ex parte* is necessary to prevent the immediate and irreparable harm that would occur if Defendants were to receive prior notice, which they would likely use to destroy evidence, dissipate assets, and otherwise frustrate the Court's ability to grant effective relief.

**1. Preventing further fraud and evidence destruction**

The need to enjoin Defendants from pursuing their fraud scheme and destroying evidence is manifest. As noted, a primary reason Congress enacted Section 1345 was to ensure that innocent people would not "continue to be victimized" by fraud schemes during the pendency of criminal investigations and proceedings. S. Rep. No. 98-225, at 401–02. Given the evidence cited above, there can be no doubt that enjoining Defendants from continuing to pursue their fraud scheme is justified. The same goes for prohibiting the destruction of evidence; Defendants have no legitimate interest in defrauding victims or destroying evidence that could outweigh the United States' interest in preventing such conduct.

Preventing Defendants from incorporating or exercising control over additional corporate entities in furtherance of the scheme is essential if the prohibition on fraud is to be effective. Defendants are skilled at using shell entities and sham companies to disguise their operations. *See supra* at 2–9. The sham companies likely are not the only sham companies that Defendants have used in their fraud scheme, and the United States is still in the process of identifying all the relevant companies and straw owners. *See* Chung Aff. at ¶ 41. The entry of an *ex parte* TRO broadly prohibiting the use of corporate entities in the fraud scheme and requiring Defendants to disclose relevant information about all corporate entities over which they exercise control is thus necessary to protect potential victims.

**2. Freezing Defendants' assets**

Immediately freezing the assets in accounts held by or in the names of Defendants Eide, Smith, CB Surety, Peak Bakery, Cascades Pointe, KP Testing, Reseller Consultants, Inc., Ambragold, Motion Media Marketing Inc., SJC Financial Services Inc., Think Processing LLC,

and Bass Business Consultants is also necessary to prevent the alienation or disposing of funds held in their accounts. As noted, Section 1345(a)(2) specifically authorizes a court to freeze a defendant's assets where there is evidence that the defendant "is alienating or disposing of property, or intends to alienate or dispose of property, obtained as a result of a banking law violation." *See* 18 U.S.C. § 1345(a)(2); *see also* 18 U.S.C. § 3322(d) (defining "banking law violation" to include violations of Section 1344 and violations of Section 1343 "affecting a financial institution").

If the above-identified Defendants' assets are not frozen, it is highly likely that Defendants will alienate or dispose the proceeds of this scheme. First, Defendants are sophisticated users of the banking and payment process systems. The Knox Secure Portal, which appears to be the digital hub of the scheme designed to suit Defendants' needs and tailored to facilitate the scheme, has managed to disguise the true nature of thousands if not millions of financial transactions from sophisticated entities, including some of the country's largest acquiring banks. Second, Defendants have at their disposal numerous shell entities as well as over 100 sham companies, which they have already used to disguise the proceeds of their scheme. Third, Defendants frequently intermingle funds in their personal and business bank accounts. *See* Chung Aff. ¶ 146. Fourth, Defendants have shown themselves capable of creating in the matter of days sham companies that they control but are difficult to trace to Defendants. Consequently, it is high likely, if not inevitable, that Defendants will employ this knowledge, experience, and array of business entities to quickly alienate and hide the proceeds of their fraudulent scheme.

An *ex parte* order freezing the assets of the above-identified Defendants is necessary to prevent this from occurring. *C.f. Cardiff*, 2018 WL 5622644, at *2, 6 (issuing TRO freezing assets without notice); *FTC v. Am. Mortg. Consulting Grp., LLC*, No. SACV12-01561 DOC, 2012 WL 4718927, at *1–2 (C.D. Cal. Oct. 1, 2012) (same).

**3. Receivership**

Appointing a receiver over CB Surety, Peak Bakery, Cascades Pointe, KP Testing, Reseller Consultants, Inc., Ambragold, Motion Media Marketing Inc., SJC Financial Services Inc., Think Processing LLC, and Bass Business Consultants, as well as any other entity that the receiver determines is controlled or owned by these entities or Defendants Eide or Smith (the "Receivership Entities"), is also critical to ensure that the asset freeze is effective. The Ninth Circuit has explained that when deciding whether to appoint a receiver, a court should consider factors including the strength of the plaintiff's claim, the likelihood of fraud, the danger that property in which the plaintiff has an interest will be lost, and whether the harm to plaintiff by denial of the appointment would outweigh the injury to the defendant. *See Canada Life Assur. Co. v. LaPeter*, 563 F.3d 837, 844 (9th Cir. 2009). Here, all of the relevant factors support the appointment of a receiver. The evidence explored supra demonstrates that the United States has a compelling 18 U.S.C. § 1345 claim against Receivership Entities and is overwhelmingly likely to succeed in proving fraud.

The United States and victims have a strong claim to a portion of the funds in the possession of the Receivership Entities and the harm in losing those funds outweighs any harm in having a temporary receiver safeguard those funds.

The United States' concern that Eide is unlikely to voluntarily abide by an asset freeze is reinforced by a January 2011 Virginia state court finding that Eide fraudulently concealed assets from a creditor after a company he controlled defaulted on a loan. *A. David Muddiman, III v. Venture Investment Properties Group, Inc., et al.*, No. CL09-1050 (Cir. Court of Henrico County, Virginia, Jan. 10, 2011) (filed in Chapter 7 proceeding in *Muddiman v. Eide*, No. 16-30067, ECF Doc. 13 (N.D. Ca. Sept. 20, 2016)). The court found that Eide represented that his company lacked funds to pay creditors while in fact fraudulently conveying hundreds of thousands of dollars from the company to another entity for continued use. *Id.* ("Mr. Eide . . . made decisions to get [creditor's] debt out of the picture so that [he] could obtain additional

financing to continue operating [his companies].”). While evading creditors, Eide used these funds to continue to pay himself.

The United States’ investigation has not identified any portion of the Receivership Entities’ business that does not involve fraud. A temporary receiver will be able to determine whether the Receivership Entities have legitimate operations, and if so, enable the Receivership Entities to continue to pursue that business. Courts in this District and throughout the country have appointed receivers in analogous circumstances, and the Court should do so here. *See, e.g.*, Order Granting *Ex Parte* Application for Temporary Restraining Order, *United States v. Internet Transaction Servs., Inc.*, No. 2:21cv6582 (C.D. Cal. Aug. 20, 2021), ECF No. 19; *Cardiff*, 2018 WL 5622644, at *2; *Digital Altitude*, 2018 WL 1146679, at *1; *United States v. Hoffman*, 560 F. Supp. 2d 772, 777–78 (D. Minn. 2008).

## IV. THE UNITED STATES WILL NOTIFY DEFENDANTS PROMPTLY FOLLOWING ENTRY OF THE TRO AND ORDER

Following the issuance of the TRO and order to show cause, the United States will promptly notify all Defendants per the requirements of Federal Rule of Civil Procedure 65. To do so, the United States intends to serve all Defendants located in the United States pursuant to the requirements of Rule 4.

Though the United States believes that Defendant Bryan Bass may be in India, the United States is uncertain as to, and has not been able to confirm, Bass’s precise, current location. This uncertainty limits the United States’ ability to expeditiously serve him pursuant to Rule 4(f). However, notice under Rule 65 is different concept from service of process under Rule 4, and it is well established that notice can be provided to a defendant through means not normally authorized under Rule 4. *C.f. Glasser v. Blixseth*, No. C14-1576 RAJ, 2014 WL 12514894, at *1 (W.D. Wash. Nov. 14, 2014) (alterations in original) (“Rule [65] does not specify the kind of notice to be given. The sufficiency of notice is for the trial court’s determination under the circumstances of each particular case.”) (quoting *SEC v. Cap. Growth Co., S.A.*, 391 F. Supp. 593, 600 (S.D.N.Y. 1974)). Accordingly, when seeking preliminary relief under 18 U.S.C. §

1345 against a foreign defendant whose location is unknown, the United States has in the past provided notice by email, while simultaneously pursuing formal service. *See, e.g.*, Preliminary Injunction Order, *United States v. Elagoon Business Solutions PVT Ltd.*, No. 19-324 (W.D. Wash. May 2, 2019) (authorizing notice via email).

The United States proposes to follow that procedure here. As such, the proposed TRO includes authorization to use email to provide notice to Defendant Bryan Bass, using email addresses commonly utilized by him in the commission of the fraud scheme. The emails providing notice to Bass will attach copies of the TRO and all filings in the case and will include the following language: "This email does not constitute, and is not intended to constitute, formal service of judicial documents in accordance with the requirements of Federal Rule of Civil Procedure 4 or the Hague Service Convention. This email is for notification purposes only." The United States will thus ensure that all Defendants receive prompt notice of the TRO and preliminary injunction hearing pursuant to Rule 65, while simultaneously taking steps to effect service under Rule 4(f).

## V. CONCLUSION

Defendants' ongoing fraudulent scheme is responsible for substantial financial losses to victims. The facts summarized above and set forth in the attached affidavit provide ample evidence that Defendants are engaged in and conspiring to engage in bank fraud and wire fraud. Immediate injunctive relief under 18 U.S.C. § 1345 is therefore necessary. Accordingly, the United States requests that the Court grant the proposed *ex parte* TRO and preliminary injunction, to put a stop to Defendants' ongoing victimization of vulnerable consumers and their banks.

Dated: December 1, 2023

PHILLIP A. TALBERT
United States Attorney

TARA AMIN
Assistant United States Attorney

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

ARUN G. RAO
Deputy Assistant Attorney General

AMANDA N. LISKAMM
Director, Consumer Protection Branch

RACHAEL L. DOUD
Assistant Director, Consumer Protection Branch

ANDREW K. CRAWFORD
FRANCISCO L. UNGER
Trial Attorneys
United States Department of Justice

*Attorneys for Plaintiff United States of America*