UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>CB SURETY LLC et al.,<br><br>Defendants. | No.  2:23-cv-02812-TLN-DB<br><br><br><br>**ORDER** |

This matter is before the Court on the Court's Order requiring Defendants Thomas Eide, Travis Smith, CB Surety LLC, Peak Bakery LLC, Cascades Pointe at Clemson LLC, KP Testing LLC, Stephen Christopher, Motion Media Marketing Inc., SJC Financial Services Inc., Aric Gastwirth, Reseller Consultants Inc., Ambragold Inc., Bryan Bass, Think Processing LLC, and Bass Business Consultants (collectively, "Defendants") to show cause why Plaintiff United States of America's ("Plaintiff") Motion for a Preliminary Injunction should not be granted.  (ECF Nos. 7, 19.)  Defendants Aric Gastwirth, Thomas Eide, Cascades Pointe at Clemson, LLC, Reseller Consultants, Inc., and Ambragold, Inc. filed responses.  (ECF Nos. 21, 23, 25–26.)  Plaintiff United States of America ("Plaintiff") filed replies.  (ECF Nos. 29–30.)  For the reasons set forth below, the Court GRANTS Plaintiff's motion.  (ECF Nos. 1–2.)

///

///

**I.     FACTUAL AND PROCEDURAL BACKGROUND**

This case concerns an alleged ongoing wire and bank fraud scheme.  Plaintiff is the United States of America.  (ECF No. 1 at ¶ 9.)  Defendants are individuals and corporate entities, both domestic and foreign, who operate various businesses throughout the United States and India.  (*Id.* at ¶¶ 10–24.)  Plaintiff alleges Defendants' businesses are illegitimate and exist only to further their wire and bank fraud scheme in violation of 18 U.S.C. §§ 1343, 1344, and 1349.  (*See* ECF No. 1 at ¶¶ 1–6.)

   A.     <u>Relevant Background on Payment Card Transactions</u>

In today's marketplace, consumers often make transactions via credit or debit cards that they obtain from their bank or lender.  (*See* ECF No. 1 at ¶ 27.)  These credit or debit cards are associated with a particular card network (e.g., Visa, Mastercard, American Express, Discover, etc.), and merchants who wish to accept a consumer's credit or debit card must apply for a merchant account with their bank or lender.  (*Id.*)

When a consumer pays a merchant for a good or service using a credit or debit card, many entities are involved in the transaction to ensure the money is transmitted from the consumer's bank or lender (the "issuing bank") to the merchant's bank account (the "acquiring bank").  (*Id.* at ¶ 26.)  The merchant receives the consumer's payment through a card-reading device or the merchant's website, known as a payment gateway.  (*Id.* at ¶ 28.)  A payment processor then routes the consumer's card data to the card network and banks, and the issuing bank will verify whether there are sufficient funds in the consumer's account for the transaction.  (*Id.*)  If there are sufficient funds, the issuing bank will authorize the consumer's account and send an approval message to the payment gateway used by the merchant.  (*Id.*)

Before accepting a merchant's application for a merchant account, acquiring banks and payment processors often assess the merchant's business and the risks associated therewith, including evaluating the merchant's financial stability, chargeback rate,[1] the products or services

---

[1]   The chargeback rate is the total number of chargebacks — disputed credit or debit card transactions that result in the issuing bank reversing the consumer's charge, typically from an unauthorized or fraudulent purchase — in a month divided by the total number of transactions in that month.  (ECF No. 1 at ¶¶ 33–35.)

offered, among other things. (*Id.* at ¶ 29.) However, acquiring banks do not only vet merchants at the merchant account application stage. The card networks require acquiring banks to regularly monitor the merchants they do business with to ensure the merchants are legally compliant and comply with the card network's policies.[2] (*Id.* at ¶ 30.) Acquiring banks also have a financial incentive to monitor the merchants they do business with because they frequently assume the risk of loss during the chargeback process.[3] (*Id.* at ¶¶ 33–39.) Moreover, card networks may penalize acquiring banks that fail to adequately monitor their merchants, either by issuing monetary fines or revoking access to their products. (*Id.* at ¶ 30.) As a result, acquiring banks generally close merchant accounts for merchants who violate the law, the card network's policies, or otherwise expose the acquiring bank to a risk of financial loss. (*Id.* at ¶ 31.) Card networks and payment processors maintain lists of merchants who have had their accounts closed for engaging in prohibited activity. (*Id.* at ¶ 32.)

B.   Structure of the Alleged Scheme

Plaintiff alleges Defendants defraud consumers and financial institutions in two primary ways. First, Plaintiff alleges Defendants help unqualified merchants obtain merchant accounts. (*Id.* at ¶ 41.) Plaintiff alleges Defendants accomplish this by creating sham companies and misrepresenting the nature of their businesses and transactions to avoid detection from acquiring banks and other parties. (*Id.*) Second, Plaintiff alleges Defendants help these unqualified Defendants maintain their merchant accounts by artificially lowering their chargeback rates. (*Id.* at ¶ 42.) Plaintiff alleges Defendants accomplish this by, among other things, using prepaid debit cards to create fake transactions between two or more of their sham companies to inflate the total

---

[2]   Many card networks have a policy that a merchant's chargeback rate may not exceed a certain percentage within a specified period.

[3]   When a consumer disputes a transaction with the issuing bank (initiating the chargeback process), the issuing bank will typically credit the consumer's account and deduct the value of the credit from the merchant's account with the acquiring bank via a payment processor. (ECF No. 1 at ¶ 34.) Because merchant accounts at an acquiring bank serve as a line of credit for the merchant, the consumer's refund will initially come from the acquiring bank. (*Id.* at ¶ 38.) The acquiring bank must then seek reimbursement from the merchant, provided the merchant is willing and able to pay. (*Id.*) A merchant's high chargeback rate may also expose the acquiring bank to liability for facilitating fraud or other unlawful conduct. (*Id.* at ¶ 39.)

1  number of transactions, thereby decreasing the chargeback rate.  (*Id.* at ¶¶ 73–76.)

2          C.      <u>Procedural History</u>

3  On December 1, 2023, Plaintiff filed the instant complaint against Defendants, seeking to

4  enjoin them from violating 18 U.S.C. §§ 1343, 1344, and 1349.  (ECF No. 1.)  That same day,

5  Plaintiff moved ex parte for an order: (1) temporarily restraining Defendants from engaging in

6  wire and bank fraud; (2) freezing certain assets; and (3) appointing a receiver to ensure

7  compliance therewith.  (ECF No. 2)

8  On December 6, 2023, the Court granted Plaintiff's ex parte motion for a temporary

9  restraining order, finding there is good cause to believe that: (1) Defendants have engaged in and

10  are likely to engage in acts or practices that violate 18 U.S.C. §§ 1343, 1344, and 1349, and that

11  Plaintiff is likely to prevail on the merits of its action; (2) immediate and irreparable harm will

12  result from Defendants' ongoing violations of 18 U.S.C. §§ 1343, 1344, and 1349 unless they are

13  immediately restrained and enjoined by order of this Court; (3) immediate and irreparable damage

14  to the Court's ability to grant effective relief will occur from the transfer, destruction, or other

15  dissipation or concealment by Defendants of their assets or records unless Defendants are

16  immediately restrained and enjoined by order of this Court without prior notice to Defendants; (4)

17  the assets of the corporate entities and Defendants Eide and Smith should be frozen; (5) it is

18  necessary to appoint a temporary receiver over the corporate entities, as well as any other entity

19  the receiver determines is controlled or owned by the corporate entities, Defendant Eide, or

20  Defendant Smith; and (6) weighing the equities, immediate injunctive relief is in the public

21  interest.  (ECF No. 7 [hereafter "TRO"].)  The TRO was set to expire on December 20, 2023, and

22  the Court set a hearing, pursuant to Federal Rule of Civil Procedure 65(b)(3), for December 14,

23  2023, and ordered Defendants to show cause why the preliminary injunction requested by

24  Plaintiff should not be granted.

25  On December 11, 2023, Defendant Eide, in pro per, moved for an extension of time to

26  submit his responsive pleading and to obtain counsel.  (ECF No. 10.)  The following day, attorney

27  Candace Fields filed her notice of appearance on behalf of Defendant Eide.  (ECF No. 14.)

28  On December 13, 2023, the Court granted Defendant Eide's motion for an extension of

1   time and continued the preliminary injunction hearing to January 11, 2024.  (ECF No. 15.)

2        On December 18, 2023, Plaintiff requested the Court extend the duration of the TRO until

3   the conclusion of the hearing on January 11, 2024, and the Court issues its ruling.  (ECF No. 16.)

4   The Court noted Plaintiff's request for an extension did not address whether the Court had

5   authority to extend the TRO beyond an additional period of 14 days absent Defendants' consent.

6   (ECF No. 17.)  The Court admonished Plaintiff that if it was unable to provide additional

7   authority on this point or obtain Defendants' consent, the Court would extend the TRO an

8   additional 14 days, advance the hearing date to January 3, 2024, and revise the parties' briefing

9   schedule.  (ECF No. 17.)

10       On December 20, 2023, Plaintiff amended its request to extend the TRO and requested the

11  Court extend the duration of the TRO to January 3, 2024.  (ECF No. 18.)  That same day, the

12  Court: (1) extended the duration of the TRO until the parties had an opportunity to be heard on

13  January 3, 2024, and the Court issues its ruling; and (2) advanced the hearing to January 3, 2024,

14  and modified the parties' briefing schedule.  (ECF No. 19.)

15       On December 28, 2023, attorney Manuel Medrano filed his notice of appearance on behalf

16  of Defendants Ambragold, Inc., Aric Gastwirth, and Reseller Consultants, Inc.  (ECF No. 20.)

17  That same day, Defendant Gastwirth filed his response to the TRO.  (ECF No. 21.)

18       On December 29, 2023: (1) Defendants Ambragold, Inc. and Reseller Consultants, Inc.

19  filed their response to the TRO (ECF No. 23); (2) Ms. Fields filed her notice of appearance on

20  behalf of defendant Cascades Pointe at Clemson LLC (ECF No. 24); (3) Defendants Eide and

21  Cascades Pointe at Clemson LLC filed their response[4] to the TRO (ECF Nos. 25, 26); (4) Oliver

22  Kiefer filed his notice of appearance on behalf of Receiver Kenneth Jones ("Receiver") (ECF

23  No. 27); and (5) Receiver filed his first interim report ("Report")[5] (ECF No. 28).

---

[4]  Defendants Eide and Cascades Pointe at Clemson LLC's response included a request for additional time to respond to the TRO.  The Court DENIED that request at the preliminary injunction hearing on January 3, 2024.

[5]  The Report largely substantiates Plaintiff's allegations in its Complaint and moving papers.  In light of the Report's findings, Receiver requests: (1) to provide the next status report 60 days from January 3, 2024, and if applicable, every 60 days thereafter; and (2) to include Won

On January 2, 2024, Plaintiff filed its replies to Defendants Eide, Cascades Pointe at Clemson LLC, Ambragold, Inc., Aric Gastwirth, and Reseller Consultants, Inc.'s responses to the TRO. (ECF Nos. 29, 30.)

On January 3, 2024, the Court held the preliminary injunction hearing. Defendants Eide, Cascades Pointe at Clemson LLC, Ambragold, Inc., Aric Gastwirth, and Reseller Consultants, Inc. appeared by and through their respective counsel. (ECF No. 32.) Defendant Bryan Bass, in pro per, appeared remotely via Zoom. (*Id.*) The Court heard oral argument as to whether the TRO should be converted into a preliminary injunction and indicated the TRO will remain in place until the Court issues its ruling.

## II. STANDARD OF LAW

Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)). "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter*, 555 U.S. at 20. A plaintiff must "make a showing on all four prongs" of the *Winter* test to obtain a preliminary injunction. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). In evaluating a plaintiff's motion for a preliminary injunction, a district court may weigh the plaintiff's showings on the *Winter* elements using a sliding-scale approach. *Id.* A stronger showing on the balance of the hardships may support issuing a preliminary injunction

---

it All, Inc. in his investigation and any other entities suspected to be involved in Defendants' alleged wire and bank fraud scheme to determine the extent of their role. (ECF No. 28 at 11.) The Court GRANTS Receiver's first request regarding the reporting timelines and GRANTS Receiver's second request as to Won it All, Inc. If Receiver determines additional entities should be included in his investigation, Receiver shall promptly notify the Court and present his request to the Court along with any supporting documentation.

even where the plaintiff shows that there are "serious questions on the merits … so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id.* Simply put, Plaintiff must demonstrate, "that [if] serious questions going to the merits were raised [then] the balance of hardships [must] tip[ ] sharply in the plaintiff's favor," in order to succeed in a request for preliminary injunction. *Id.* at 1134–35 (emphasis added).

### III. ANALYSIS

Defendants who have appeared and responded in this matter do not oppose the issuance of a preliminary injunction outright. Rather, they take issue with certain aspects of the TRO and request the Court modify its provisions to the extent the TRO will be converted into a preliminary injunction. (*See* ECF Nos. 21, 23, 25–26.) The Court will address each argument in turn.

#### A. The Fifth Amendment

The Fifth Amendment guarantees that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. "The Fifth Amendment privilege against self-incrimination extends only to 'compelled incriminating communications' that are 'testimonial in character.'" *In re Twelve Grand Jury Subpoenas*, 908 F.3d 525, 527 (9th Cir. 2018) (quoting *U.S. v. Hubbell*, 530 U.S. 27, 34 (2000)). Sections III.C–E of the TRO require Defendants to, among other things, cooperate with Receiver, transfer certain property to him, and provide him with various corporate documents. (*See* ECF No. 7 at 11–13.) Defendants Gastwirth and Eide argue complying with sections III.C–E of the TRO would violate their Fifth Amendment right against self-incrimination, and not complying with sections III.C–E may expose them to contempt. (ECF No. 21; ECF No. 25 at 3–4.) Defendants Gastwirth and Eide therefore request the Court exclude those provisions, as to them, from any forthcoming preliminary injunction. (ECF No. 21; ECF No. 25 at 3–4.) In opposition, Plaintiff contends Defendants Gastwirth and Eide's argument is expressly foreclosed by *Braswell v. U.S.*, 487 U.S. 99 (1988).

In *Braswell*, the Supreme Court was presented with the question of whether the custodian of corporate records may resist a subpoena for such records on the basis that the act of production would incriminate him in violation of the Fifth Amendment. 487 U.S. at 100. The petitioner, Mr. Braswell, operated his business as a sole proprietorship before incorporating Worldwide

Machinery Sales, Inc., and conducting his business through that entity. *Id.* at 100–01. The following year, Mr. Braswell incorporated Worldwide Purchasing, Inc. *Id.* at 101. Both companies filed their corporate tax returns and had three corporate directors, although none of them had any material control or authority over the businesses. *Id.* A few years later, a federal grand jury subpoenaed Mr. Braswell in his capacity as president of the two corporations, requiring him to produce the books and records of the corporations.[6] *Id.* Mr. Braswell moved to quash the subpoena, arguing that the act of producing the records would incriminate him in violation of his Fifth Amendment privilege against self-incrimination. *Id.* The district court rejected this argument, finding that the collective entity doctrine applied, and the Fifth Circuit and Supreme Court affirmed. *Id.* at 102. In affirming the lower courts' rulings, the Supreme Court reaffirmed the principle embodied in the collective entity doctrine that:

> the custodian of corporate or entity records holds those documents in a representative rather than a personal capacity. Artificial entities such as corporations may act only through their agents … and a custodian's assumption of his representative capacity leads to certain obligations, including the duty to produce corporate records on proper demand by the Government. Under those circumstances, the custodian's act of production is not deemed a personal act, but rather an act of the corporation. Any claim of Fifth Amendment privilege asserted by the agent would be tantamount to a claim of privilege by the corporation—which of course possesses no such privilege.

*Id.* at 109–10.

The Court agrees with Plaintiff and finds that compliance with sections III.C–E of the TRO, or similar language in any future order, does not run afoul of the Fifth Amendment. The parties do not dispute that Defendants Gastwirth and Eide are custodians for their respective entities — Reseller Consultants, Inc. and Ambragold, Inc. for Defendant Gastwirth and Cascades

---

[6] The subpoena in *Braswell* is far more extensive than the sections of the TRO at issue here, and required Mr. Braswell to produce: "receipts and disbursement journals; general ledger and subsidiaries; accounts receivable/accounts payable ledgers, cards, and all customer data; bank records of savings and checking accounts, including statements, checks, and deposit tickets; contracts, invoices—sales and purchase—conveyances, and correspondence; minutes and stock books and ledgers; loan disclosure statements and agreements; liability ledgers; and retained copies of Forms 1120, W–2, W–4, 1099, 940 and 941." 487 U.S. at 101 n.1.

Pointe at Clemson, LLC for Defendant Eide — or that the documents sought by Receiver are corporate documents. It is also clear that Reseller Consultants, Inc., Ambragold, Inc., and Cascades Pointe at Clemson, LLC are "corporations or other collective entities" subject to the collective entity doctrine. *Braswell*, 487 U.S. at 104 ("[W]e have long recognized that, for purposes of the Fifth Amendment, corporations and other collective entities are treated differently from individuals."); *In re Twelve Grand Jury Subpoenas*, 908 F.3d at 530–31 (applying the collective entity doctrine to limited liability companies). Thus, Defendants Gastwirth and Eide may not refuse to cooperate with or otherwise refuse to provide corporate documents to Receiver on Fifth Amendment grounds.[7] *In re Twelve Grand Jury Subpoenas*, 908 F.3d at 530–31.

Accordingly, the Court declines to exempt Defendants Gastwirth and Eide from sections III.C–E or similar language contained in the preliminary injunction.

          B.      <u>Asset Freeze</u>

Defendants Reseller Consultants, Inc. and Ambragold, Inc. argue any forthcoming preliminary injunction should not freeze their assets.[8] (ECF No. 23 at 5.) They contend Plaintiff has failed to demonstrate their business practices were conducted with an intent to deceive and cheat as required by Ninth Circuit precedent. (*Id.* at 5–13.) In other words, Defendants contend Plaintiff has failed to demonstrate it is likely to succeed on the merits of its wire fraud claim, and therefore, a preliminary injunction with an asset freeze should not issue as to them. (*See id.*)

In opposition, Plaintiff argues Defendants Reseller Consultants, Inc. and Ambragold, Inc.'s roles in the wire and bank fraud scheme justify an asset freeze, and that the evidence demonstrates they engaged in transaction laundering, which is sufficient to demonstrate an intent

---

[7]     It should also be noted that Receiver is an agent of the Court and not an agent of Plaintiff or any prosecuting body. The parties did not address whether this distinction makes a difference because Defendant Gastwirth insinuated, at the hearing, that Receiver openly shares information with Plaintiff. In any event, nothing in this Order should be construed to limit Defendants' ability to assert a *personal* Fifth Amendment privilege. Moreover, Plaintiff concedes, as it must, that it cannot make evidentiary use of the individual act against the individual. (ECF No. 29 at 3 n.1.)

[8]     Defendants Reseller Consultants, Inc. and Ambragold, Inc. also argue the Court should vacate the asset freeze as to Run It Up, Inc. (ECF No. 23 at 13.) Run It Up, Inc. is not a party to this action and no appearance or motion for intervention has been made on its behalf. Accordingly, the Court declines to address this argument at this time.

to deceive and cheat. (ECF No. 30 at 3–6.)

Section 1345 authorizes a court to issue an injunction and freeze a person's assets if that person is "alienating or disposing of property, or intends to alienate or dispose of property, obtained as a result of a banking law violation."[9] 18 U.S.C. § 1345(a)(2). As noted above, "the appropriate legal standard to analyze a preliminary injunction motion requires a district court to determine whether a movant has established that … he is likely to succeed on the merits of his claim … ." *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023). To prevail on a wire fraud claim, a plaintiff must demonstrate an intent to deceive and cheat. *U.S. v. Miller*, 953 F.3d 1095, 1103 (9th Cir. 2020) ("[W]ire fraud requires the intent to deceive and cheat — in other words, to deprive the victim of money or property by means of deception.")

The Court agrees with Plaintiff and finds there is sufficient evidence of Defendants Reseller Consultants, Inc. and Ambragold, Inc.'s intent to deceive and cheat, and therefore, Plaintiff has demonstrated it is likely to prevail on the merits of its wire fraud claim. Plaintiff has proffered evidence that Defendants Reseller Consultants, Inc. and Ambragold, Inc. utilize sham companies to misrepresent the nature of their businesses and transactions to avoid detection from acquiring banks and other parties in furtherance of their transaction laundering scheme. (*See, e.g.*, ECF No. 1 at ¶ 41; ECF No. 2-3 at ¶¶ 39–41, 50–53, 106, 110.) Likewise, there is evidence that Defendants Reseller Consultants, Inc. and Ambragold, Inc. were assisting with and contributing to the artificial lowering of merchants' chargeback rates. (*See, e.g.*, ECF No. 1 at ¶ 42; ECF No. 2-3 at ¶¶ 103–107, 109.) Both of these tactics evince an intent to deceive, cheat, and deprive financial institutions of money or property. *Miller*, 953 F.3d at 1101. In any event, Plaintiff also alleges Defendants Reseller Consultants, Inc. and Ambragold, Inc. violated 18 U.S.C. § 1344, and that section does not require an intent to deceive and cheat and supports the imposition of an injunction and asset freeze. *Shaw v. U.S.*, 580 U.S. 63, 67 (2016) (18 U.S.C. § 1344 does not require an intent to cause financial loss); 18 U.S.C. § 1345(a)(2) (permitting an asset freeze for banking law violations); 18 U.S.C. § 3322(d)(1) (defining "banking law

---

[9] A "banking law violation" includes violations of, or conspiracies to violate, 18 U.S.C. §§ 1343, 1344. 18 U.S.C. § 3322(d)(1).

violation" as a violation of 18 U.S.C. § 1344, among other things).

Accordingly, the Court finds there is sufficient evidence of Defendants Reseller Consultants, Inc. and Ambragold, Inc.'s intent to deceive and cheat, and therefore, Plaintiff has demonstrated it is likely to prevail on the merits of its wire fraud claim.

## II. CONCLUSION

For the foregoing reasons, the Court GRANTS Plaintiff's motion for a preliminary injunction. (ECF Nos. 1–2.) The terms of the preliminary injunction will be included in an Order to follow the instant Order. To the extent the two Orders conflict, this Order prevails.

IT IS SO ORDERED.

Date: January 5, 2024

_____
Troy L. Nunley
United States District Judge

11